The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Good to see you. Chief Judge Gregory and may it please the court, my name is Mark Sigmund and I represent the appellant, Justin Fessler. The issue here is whether there was any limit on an employer's ability to make clear, official, and false representations to its employees, fully intending for those employees to rely on those representations. Can an employer make a representation like that and then escape liability at the 12B6 stage no less, simply by citing ambiguous, supposedly contrary, and importantly here, non-contractual representations in another document in the pile of documents in the case? The answer to that question should be no and the court should reverse. My client's main claim here was fraud. The statement that was fraudulent was, we won't cap you. That statement we clearly alleged was false. We attached testimony from an IBM employee stating that capping is one of your commission's formulas that says we'll pay you X, but we pay you less than that. That's the sensible definition of that. What is a cap is also a term of art and if we get discovery in here, the evidence is going to show that what happened here was a cap, regardless if it was a cap on an individual transaction or on multiple transactions. Finally, we've alleged here clearly that if we get discovery, the emails sent internally at IBM about what happened here are going to show and use the word cap. We know that because we've taken deposition and discovery in multiple other cases, including in the Choplin case, which we reference heavily in the complaint here. Is that the North Carolina case? It is, your honor, yes. All of the emails that IBM sends use the word cap. How much are we going to cap this guy? What size cap do we need to cap? They use the word. I think we've clearly alleged that what happened here was a cap. Our prior decisions in foremost guarantee and a couple other cases say that applying Virginia law, that if there is a oral representation that's inconsistent with a written document, something a written document, it's not reasonable to rely on it. Do you agree with that general proposition? We have explicitly withdrawn the claim for fraud based on oral representations here. So is the misrepresentation the PowerPoint? Correct. Do you think that if a PowerPoint, and I understand that I guess is distinctly different from an analytical standpoint than the oral representation? It is, your honor. And first of all, the reason we dropped the oral fraud is because those statements were the same statements. It was we won't cap you. So we didn't need it. It was kind of redundant. So we were fine getting rid of it. But your point is that a statement made orally is different than a statement flashed on a PowerPoint? I think the law would hold that written fraud is easier to prove than oral fraud. So your claim is that those are dueling written representations? Is that what you're suggesting? Dueling written and also neither one is a contract. Right? And so yes. It doesn't have to be a contract. A lot of the cases talk about disclosures and things that aren't contracts. So I mean the written document here, the IPL, doesn't have to be a contract to be something that would necessarily, that might trump. Sure. And I would respond to that multiple ways. Number one, IBM has testified that the PowerPoint provides the most detailed information. That's a quote about the plan. As the court in Swofford noted, the IPL calls itself the primary educational material about the plan. And so if you had to choose one or the other, I think one should choose the PowerPoint. How many of these cases are going on? Or have there been in the Fourth Circuit? In the Fourth Circuit, there's, so Chopin was resolved. There's one pending in North Carolina called Stevenson. There's this one. There's one called Mallon that Judge Brinkema just denied that motion on Friday. And then there's one, Martin Yeti in Maryland. So I believe five in this circuit. And then there's some pending in California. And they're not all identical? Well, so, Your Honor, my co-counsel and I are counsel in all of these but one. And our complaints there are irrelevant. So you think they are identical? More or less, yes. And the district courts are going different directions? Right now, they're four to three in our favor. On motion to dismiss, yes. How many different district judges? Two, one, two, three. I think we've round about eight, I believe. And which one of those opinions do you like the best? I'll ask him the same question. He'll give a different answer than you do. That's a fair question. And I would say Swofford. Pardon? Swofford in California. Well, in the Fourth Circuit. So the only opinion we have, well, we have Vinson, which is a fine opinion. I like Vinson. But, I mean, honestly, Judge Brinkema's opinion on Friday, her opinion is very short because she just says, for the reasons I stated, but I interpret her rationale briefly. Who wrote that one? Judge Brinkema. Judge Brinkema. And I would interpret her. Who wrote the one in North Carolina that she liked? Judge Schroeder. Judge Schroeder. And the reason I like Judge Brinkema is because it's very brief, but she basically says, you know what, when you have these dueling representatives. Judge Brinkema is in the same district as this case. Yes. And she fairly said. And the judges go different directions. And she admitted that. She said, I don't fully agree with Judge Ellis. I interpreted that to mean don't agree at all. But the reason. I'm the one who had to get a settlement. Yes, Your Honor. Are all those three cases, 12B6 cases that you just mentioned? Every case has either been dismissed on 12B6 or not dismissed on 12B6. All of those are either pending, have been resolved mutually by the parties. And then there is one summary judgment opinion. It's offered after multiple depositions. In California. In California. And the judge denied the entirety of IBM's summary judgment there. And honestly, that's all we're really asking for here is discovery. Because it's going to support our claims. I mean, I can't go outside of the record. But I know that because we've done discovery in all the other cases. And if you look at the complaints, you know, here we attach Choplin. I'll tell you this. In every other case, we keep attaching all of the depositions. And so the latest case has 14 depositions attached. And the reason why is because they keep saying the same thing over and over. They're not changing their testimony. They admit that all the testimony about reliance equally applies between the cases. There's no difference. And we're proud of all of those depositions. We're, you know, it's right on. And so, Your Honors, the reason I like to judge Brickam's opinion is because it's very brief. But I read from her opinion last Friday that she agrees with Judge Swofford. Because what she basically says is, look, having these dueling written representations is incredibly problematic. Very problematic. That was her ruling. And so if I had to pick one of the fourth, it would be hers. You know, again, this is not a breach of contract case. This is not about the IPL. But I do just want to say this for the record. And, Judge King, Your Honor was on the panel in the Jensen case from 2006. That's a straight breach of contract case. There's no analysis of fraud. Therefore, it doesn't apply. However, even if you wanted to sort of treat the IPL as an affirmative defense for IBM here, I'll note this. That court says clearly in that case that the reason it ruled the way it did was because that IPL allowed IBM to change the commissions up until they're paid. That opinion mentions the word paid 25 times. Literally until IBM wrote the check, they could change it. The court in Jensen said, absent that language, the situation might be very different. Vincent relied on that language. And Schwarzkopf basically ruled the same thing. Well, guess what? The IPLs here don't have that language. They don't allow IBM to change the commissions up until they're paid. The latter two don't say anything. They just say they can change it. The first IPL actually says we can change the commissions up until they're earned under the terms of the plan. What does that mean? The plan defines earned later as after the measurement of complete business results. What does that mean? Well, we need discovery. But I will tell you we've asked that exact question in the other cases, and the testimony would be very favorable to my client here. It would show that Mr. Fessler earned his commissions under the terms of the plan before they were kept. And so, again, I don't think that's the main claim. I mean, the main claim is fraud. It's can you destroy reasonable reliance simply by the existence of this document. The answer to that is no. It's not just the existence. I mean, your client, as I read the document, has to do something in response to it. I mean, it's not just there's a piece of document somewhere or even given to them. It's a document that they saw, read, and activated or something in some way. The click button is acknowledged. We are not running away from the IAPL. I mean, the reason we're not running away from it is because I don't think, like Judge Swofford held, you can have two arguably contrary representations and then just say, you know what, you just can't believe this one because of this one. I don't think that's the law. Second, and this is my point about Jensen, is that even if that's true, there's still two things to say. One is the one I just said, which is as pled, Mr. Fessler earned that under the terms of the IAPL when he was capped. And this is what, if you look at the Vinson opinion, that's what Judge Schroeder noted. He said, you know what, like Jensen said, it might be a different situation. Absent this right to change the payments up until they're paid, arguably Mr. Vinson has alleged that here. So that's the same situation. Number two, the IAPL also has this significant transactions provision. I think a jury could easily conclude that a reasonable person looking at the IAPL could think, you know what, they can change my commission if that applies, but not if it doesn't apply. And we've clearly here alleged that that significant transaction provision does not apply in this case. And the reason we've alleged that is because IBM tried to rely on that in the Choplin case, but didn't. There was a secret 10% budget at Choplin. They have a deal, 10% of revenue, that's all they're going to pay. They go to the highest earners because they're making the most bucks. They cut them down, they get to the number, that's it. They're not applying the significant transactions provision, which, you know, there's the thing about is your territory correct, is your quota correct, and then there's this provision under that called relative contribution. There's never any analysis about their performance relative to another person. And maybe as importantly, they don't ever like take commissions from one person and shift it to somebody else, which is what you'd think in a relative contribution. Well, what about as you've pled this case, the PowerPoint was viewed or presented at some early 2016, as I recall, and the events involved in the 2016 transaction took place where your client claims he was expecting a different commission and got the one he received. But then, you know, he gets, you know, another IPL in 2017. Is it your position that it's reasonable for him to still rely on the PowerPoint for the 2017 commission issues even after what he's alleged happened in 2016? It's a great question. First, just to be clear, the PowerPoint is issued every time the IPL is, so every six-month period. But your Honor's question is still a fair question. I admit that's a harder case perhaps to make to the jury, but I think that's a jury argument. I think that we definitely should win in the 2016, but, yeah, I could hypothesize a juror saying you were totally right to believe it in 2016, but, you know, you should have known better once they burned you once. I still think it's enough to go to a jury. I still think that when IPL gives you a PowerPoint that clearly says X, that you're entitled to rely on that, you know, as frankly as IBM has admitted. They admit that in 30b-6 deposition? They did, yes. Doesn't that bind the company? I think it does. And frankly, even the courts that have ruled for us have not relied on that Choplin testimony. I frankly still don't know why. We've accurately quoted it. I challenged IBM in my reply brief to point out any other examples where it's not quoted. It's fairly and accurately quoted. Their witnesses did testify that the significant transactions provision could apply, but we allege that it doesn't. To me, it's as clear as day, and I think IBM had a choice. They could have admitted that, you know, we don't tell the truth. You can't rely on us. They could have done that and paid the price for that, but they didn't. And I understand why. I wouldn't do that either if I was IBM. I would tell the world that I never lie, but when you say that, then you can't cap. And frankly, I'll say this, in some of the later cases, IBM has moved away from the argument on reasonable reliance. In the recent cases, they have not conceded it. That is not their primary argument. Their primary argument has become, you know what, you can rely on that, but what we are doing is not a cap. So they're saying that what happens here isn't a cap. The problem with that, of course, is that all their emails say it's a cap. Their witnesses say it was a cap. Or at least they say, I think one quote was, it's reasonable minds could differ on what that means, which is literally the definition of why you need a trial. And so, you know, I get why they're going away from reasonable reliance, but I don't think they're on any firmer ground when they get to the issue of what a cap is. I appreciate your position on the emails talking about caps. Of course, we can question whether that's an appropriate thing for us to consider a 12V6. I think that is something for us to think about. But based on the way you've pled the complaint, is there any, other than using the word cap, it looks to me like you've pled in 2016 that they failed to credit your client with a certain amount of the deal. And in 2017, you've pled that they applied a specific program, I forget, ATP or something like that. And that may, I mean, if we assume that is true, how does that equal a cap? Because that, yeah, I have, to the point you just said they're arguing now, it looks to me like those are issues that result in less than 5% of the commissions, but I don't understand how you say those equal a cap. Well, it's a cap because again, I mean, we're at the 12V6 stage here, but I would love to get discovery because it's a term of art. And in the industry, a cap is you have a commissions formula. So in your mind, cap is anything other than getting 5% that you, is that what it is? Yeah, it's a term of art. And this is in the complaint, I mean, most similar software salespeople, sales companies pay uncapped commissions. And they do that because it's kind of expected and standard in the industry. And so, yes, if you get 5% of sales, that's what you get. And anything less than that is a cap. That's exactly what Ms. Malecki testified to in her deposition attached to the complaint. She said it's when your formula spits out X and you get paid Y. I think that's the, it's a term of art that supports us. That's also the common language, I would say. And again, I've never in my life been so tempted to go outside of the record. I'm not going to do it, but we've asked in other cases, what is capping? And it's favorable to us. And a 30V6 witness said, reasonable minds can differ about whether it applies to sort of a single transaction or more. That was the 30V6 witness. We need a jury. At the very minimum, we need discovery. Thank you. Barnes? May it please the Court, Justin Barnes on behalf of IBM. This Court has already decided the issues that are presented in this case in the Jensen versus IBM case from 2006. Now, I'd like to start by comparing some of the facts between the Jensen case and this case and then the holdings in Jensen, and then I want to directly address Mr. Sigmund's arguments as to why he believes Jensen is inapplicable. If you look at the facts in the two cases, Mr. Jensen and Mr. Fessler both argued that IBM improperly reduced their commissions. They both argued that what IBM did to their commissions was a cap. Mr. Jensen and Mr. Fessler both argued that that was inconsistent with prior written representations by IBM. Specifically, in this case, as we know, Mr. Fessler is relying on the PowerPoint presentation, which states that payments are uncapped and earnings opportunity is uncapped. In the Jensen case, Mr. Jensen was a little less high-tech back then, and he had a glossy brochure, which also said that we will not cap your commissions. So both Mr. Jensen and Mr. Fessler both argued that IBM capped their commissions, and that was inconsistent with a prior representation by IBM that commissions would be uncapped. Mr. Fessler and Mr. Jensen both had written commission plans, which contained disclaimers in them, which gave IBM broad authority as it relates to the calculation and payment of commissions. The panel in Jensen, of which, Judge King, you were on, the panel in Jensen held that. I've been around here a long time. The panel held that the disclaimers in Mr. Jensen's incentive plan precluded his claims, and I think it's important to look at how the panel made that decision. The panel first said, you know what, the 200 percent rule in that case, it was an issue about a 200 percent rule and what happens to your commissions when they exceed 200 percent. The panel said the 200 percent rule isn't really a cap, which certainly is consistent with what IBM would argue happened in this case, but that's outside the pleading, so we won't argue that now. But the court said, this is not a cap, but it didn't stop there. The panel held, even if it was a cap, IBM, you still win, because the disclaimers in Mr. Jensen's commission plan made it clear that IBM could make changes to the commission payments and the commission plan itself, even after the sale was consummated. That is exactly the issue that is presented in this case. Mr. Fessler argues that IBM promised him uncapped commissions. He signed an IPL that had disclaimers in it, which are very similar to Mr. Jensen's, and IBM adjusted his commissions, and he says that wasn't fair. But IBM told him exactly what its policies were as it relates to commissions in the IPL, and just like Mr. Jensen's claims, Mr. Fessler's claims fail in this case. Now, I'd like to address, there are two primary arguments that Mr. Fessler is making in this case in an attempt to distinguish the Jensen decision. First, he argues that was a breach of contract case, so completely different case. That ignores the broad holdings that were issued in the Jensen case. The panel in Jensen didn't say no contract case over. It could have done that, but the panel didn't do that. The panel went on to say, IBM, your statements in your commission plan give you the right to impose a cap on commissions, even though there was a prior representation of the contrary. That's what the panel held in Jensen. That applies with equal force to the claims in this case, just as it did to Mr. Jensen's breach of contract claim. Now, the second argument that Mr. Fessler makes to try and distinguish Jensen is he points out some, what we would consider to be, minor distinctions between one of the disclaimers in Mr. Jensen's commission plan and one of the disclaimers in Mr. Fessler's commission plan. Now, Mr. Sigmund is correct that Mr. Jensen's commission plan had a right to modify or cancel clause that said IBM reserves the right to modify or cancel up until payments are made. And Mr. Sigmund also accurately described Judge Schroeder's opinion in Vinson, and that was the primary basis that Judge Schroeder distinguished the Jensen decision in that case. But what I believe Mr. Fessler is overlooking here, and what Judge Schroeder overlooked in the Vinson decision, was that, if anything, the differences between Mr. Fessler's commission plan and Mr. Jensen's mean that Mr. Fessler's was even broader. In Mr. Fessler's commission plan, in 2016, it said that IBM could make changes in the same right to modify or cancel provision. IBM could make changes to the plan or to payments up until they're earned. In 2017, the plan said IBM reserves the right to modify or cancel the plan, period. No reservation, no limitation at all. How is earn broader than pay? Because, Your Honor, in the 2016 and 2017 commission plans from Mr. Fessler, they make it clear that commissions are not earned even when they're paid. They don't become earned after they're paid in many circumstances. And I'll point to the specific provisions in the commission plan that say that. One is the earnings section itself. The earnings section say that payments are earned and no longer to be considered advances only after the end of the plan period and only after IBM measures the business results. The commission plans go on to talk about with respect to corrections adjustments for errors. Make it clear that adjustments may be made before or after the affected payment has been released. So Mr. Fessler's commission plans are clear that changes can be made even after the payments are made. Commission sales people like Mr. Fessler are told by IBM, we're going to give you payments. We don't want you to wait until we finish our go ahead and pay you, but just know there's a chance we might change that. And if we do, there is a debit balance recovery section in all of Mr. Fessler's commission plans that say, if we pay you more than you're entitled to, we reserve the right to come back and claw that back from you out of your future commissions or otherwise. So the commission plans are clear that, if anything, in Mr. Fessler's case, they're even broader and go after the payments are made, which is broader than the discretion afforded in Mr. Jensen's commission plans. Is it IBM's position that these IPLs are contracts? Your Honor, IBM's position is this, and it's a little nuanced admittedly, but I think it's important to say it this way, and IBM's been consistent on this position. The IPL is a document that spells out the parties' respective rights and responsibilities as it relates to commissions, similar to an employment handbook or policy. It is a statement of policy that spells out the responsibilities between us. It does not impose contractual obligations on IBM to pay any particular amount in commissions beyond what it has paid. Well, I understand your second position, I think. I think it says, I mean, I understand the language that says that, but I want to follow up. So understanding that you don't think it imposes contractual obligations to pay certain amounts on IBM, is it nevertheless a contract between Mr. Fessler and IBM for the other provisions? The answer is no, Your Honor. So IBM, it's not a contract for either party, it's a disclaimer type document? That's correct. And I would, just to be clear, it is not a contract under the common law contract principles. There is an open issue in California about whether it satisfies a particular statutory definition of contract, but I believe that's a different issue than common law, is this a contract between the parties? And every court that has addressed that issue, because even the decisions that deny in part IBM's motions to dismiss, has agreed that there's no contract, and you can't bring a breach of contract claim. What is the PowerPoint? The PowerPoint is just an educational document that IBM presents to its employees. Educational? Yes, Your Honor. Telling them they won't cap their commission? Telling them that payments are uncapped and that earnings opportunity is uncapped. That's educational? Yes, Your Honor. Sounds occupational to me, which will be compensated. Fair. It's to educate the employees about the terms, the policies that apply to their commission. And they expect the company to be, to mean what it says, right, in the document, in the PowerPoint? Yes, Your Honor. So why is that not fair reliance just on the PowerPoint? Because it's exactly what this court held in Jensen. And again, this is a little nuance and beyond the record. Certainly if we got to the point, I think it would, we would argue that what happened was not a cap, but admittedly that is beyond the scope of the record before this court. As this court held in Jensen, the incentive plan precludes an employee from relying on a statement like is in the PowerPoint to believe that that means IBM can never make adjustments to their commissions. It would not be reasonable for an employee to believe that. And we certainly believe that the Choplin deposition transcript should not be considered by this court. Every other court to address that has held the same way, including the 11th Circuit just last year in the perhaps. But isn't that a factual question? We have to get into the weeds in terms of determining that just because you can make adjustments, like for example, figures are incorrect, and as you said, even if the check is cut, you may have to make adjustments. But it's a question of what's, if it in effect becomes a cap as opposed to what it is. Isn't that a factual question? It would be if that were the question before this court, but that is not the question before the court. The question before the court is, assuming everything that Mr. Fessler says in his complaint is true, which we obviously would disagree with, but right now we have to assume that everything he says in his complaint is true. Even believing that. If you look at this court's prior decision in Jensen, Mr. Fessler's claims fail. Because they are exactly the same allegations that were asserted in that case. And on the Choplin depositions, even if the court were to look at those, if you look at the context and the other testimony other than what's cherry picked by the plaintiff in this case, it's clear that every single one of those witnesses testified that an adjustment is different than a cap, and that's what happened. And so that is in the document that you give out. Why does a PowerPoint have any less priority? It seems to me that when you back away from the legal significance of the IPL, you back into a situation where there are two documents. Now one is an electronic document, but this I think becomes maybe electronic too, even though we've got a copy of it here. Why do we not have dueling representations in this situation? And I've got two reasons for that, Your Honor. The first is the IPL is the only document that's actually accepted by the employee. That the employee, by accepting this incentive plan letter, you acknowledge that you have read and understood the terms of the plan. But what's that mean if it's not a contract? That seems like to me you're talking a little bit about both sides of your mouth. All for acceptance. I read that and I was like, that sounds like a contract. But you're saying it's not a contract, so I'm not sure what that means. But anyway, I understand your position on that. It's pretty hard to say they understood it, but all these judges don't even understand it. I would agree with that, Your Honor. I'm sure they each of them read it. They said they read and understood it. The first part probably did, but the second part, I mean. My position would be some judges understood it and some didn't. But the point about accepting the IPL is just that that's an example of why the IPL is treated as more important than the PowerPoint. But in any event, if you look at the language in the incentive plan letter, all three of them in the general information sections define the plan as including both the incentive plan letter and all of the educational materials found at this particular website, which is where the PowerPoint is. They're all part of the same thing. So the disclaimers in the incentive plan apply to all of it. They apply to the plan, not just the incentive plan letter. So what you said, whether it's a contract or not, you said that it's all incorporated in it, even the PowerPoint. That's correct, Your Honor. Even if you treated them all as having the same weight as being part of the same plan, none of it contractual under a common law sentence. The disclaimers apply to all of it. They're collectively a statement of IBM about its position with respect to how commissions will be calculated and paid. And the disclaimers apply to all of it. So you're asking us at a 12B6 stage to find as a matter of law that these provisions govern other documents that we don't really yet have the ability to read and see how they interact. Well, the only two documents that the court needs to consider for purposes of this are the IPL and the PowerPoint. And those are both in the record. What about the 30B6 deposition? How do you get around the proposition that those bind the company? The 30B6 deposition certainly bind the company in those cases. But as other courts have held, statements by employees that an employee can rely on the PowerPoint is nothing more than a legal conclusion that isn't binding on this court or any other court. If you read the actual factual testimony from those cases, it becomes clear that those witnesses consistently testified that IBM does have the right to do what it did in this case. If you just look at the cherry-picked statements where witnesses say Judge Schroeder did not consider the Choplin testimony. No court has actually considered the Choplin testimony. And to your Honor's question about this being a 12B6 and we don't have other documents, I would also point out that the 11th Circuit just affirmed in 2019 literally an identical case. If you held Mr. Middleton's complaint up to Mr. Fessler's complaint, except for a couple of little factual differences, they're nearly identical. And certainly the legal theories are identical. Didn't they rely there on some aspects of Georgia law pertaining to disclaimers that, at least from what I read, maybe I'm wrong, but sounded somewhat jurisdictionally unique? I would not call them unique. I would admit, Your Honor, that there is stronger law, more law, in Georgia on the question of whether a disclaimer like this is sufficient to preclude reliance. But in Virginia, there isn't any law going the other way. And the only law in Virginia supports us. Mr. Fessler cited this court's decision in the Hitachi case. But if you actually read the Hitachi case in its entirety, it actually helps IBM because it talks about how an essential element of fraud is someone exercising due diligence to discover the truth, potential truth, about the alleged misrepresentations. Mr. Fessler had to do no more than read the very document that he signed. And the disclaimers at issue in Hitachi were of a different nature. They actually expressly said, You can't rely on what we say. You've got to do your own investigation. And that's not at all what the disclaimers say here. But certainly the legal principles from the Hitachi case support IBM's position as a whole. Why would IBM say in the Don't you think that a person who's a commissioned salesperson would mean that cap means cap? I mean, there's no limit to, as you say, my role to success with this company. And therefore, doesn't that play into the quantum merit claim? Let me first answer that by saying that's not in the record, Your Honor. But I want to answer it from a practical standpoint. Why would IBM say that? That's because earnings opportunity is not capped at IBM. And IBM has always been up front and said, Our commission plans, there is no point at which IBM stops paying you. Now, IBM might make adjustments to some, but making adjustments to those commissions didn't impact Mr. Fessler's ability to go out and earn commissions on other deals, just like in all of these other cases. But that admittedly, that answer is not in the record itself, but I did want to answer it. You say it's not in the record. It's not in the record except the complaint. And the depositions attached to the complaint. That's part of the complaint. Correct. That's part of the complaint. There's nothing here except the complaint. Correct, Your Honor. And it has to be read in favor of the complaint. At this stage in the proceedings, yes, Your Honor. I see I'm over time, so unless there's any other questions. Thank you. Thank you, Mr. Barnes. Sigmund, you have some time left? Just a few brief points. I think the court has the issues pretty well under control here. As far as Jensen first, I would note that Judge Brinkema wrote the district court opinion in Jensen. And so IBM talked about this court's opinion in Jensen all over the place in the motion to dismiss, and she just denied that motion. So the author of the very opinion doesn't think that it controls. Second, Mr. Barnes was talking about this earn versus paid language. And Mr. Barnes said that it's possible for payments to be made before they're earned. That is true. The IPL has a plan to date advance payment, an interim payment. In the middle of the thing, you get an advance payment, but you earn it later. But the converse is also true. The IPL also contemplates payments being earned before they're paid. And that's exactly what Judge Schroeder held in Vinson. There's a possibility that it could be earned. And once they're earned, then at that point, they can't be changed. And again, if you look at the IPL here, look at the 2016. It defines full plan earnings as after the measurement of complete business results. And again, in other cases, we've taken discovery, and they've defined that as the rote process of just measuring who sold what, when, and where. So if the sale period ends on June 30th, the measurement of the business results is July 1st. So under the terms of this IPL, that's earned right then. Again, I don't think this matters. I think that we have a fraud claim aside from that. What about the issue that these IPL incorporate the website and the PowerPoint? Just to play that out, if this was a traditional written document, and they were all kind of part of one contract, and part of the things in the contract says you don't have any caps to your commission, but the next provision says, you know, that said, there's no obligation that you'll be paid any certain amount, and we can change anything you want. Would that be, would it be reasonable to rely on the non-cap in that situation? Great question. We addressed this in the brief. You know, we have always argued that the IPL and the PowerPoint are connected, because that helps us. That doesn't hurt us. If you're a salesperson, and you have one sort of set of documents, and one says we're not going to cap you, it says it right there, that's all the more reason to think that that representation is true, and the fact that it's followed up by one that has language that arguably is contradictory, but maybe not, because it mentions the significant transaction provision. So again, you might think, well, they can adjust it there, but not elsewhere. Then there's this stuff about earned, and you could think, well, okay, I mean, I earned it before, you know, so it's not clear as day, but yeah, given that they're connected, I think that makes reliance on the PowerPoint all the more reasonable, and, you know, that's a great argument for a jury trial. I'd love to be arguing in closing right now about why that's that, and Mr. Barnes can argue the other way, and I think that we should get there. Briefly, you know, Mr. Barnes talked about how, you know, the testimony of you can rely on this as a legal conclusion. I just don't understand that. The idea about whether salespeople in this industry, given all the facts, given everything else, is their reliance reasonable? I mean, to me, that is not a legal conclusion. That is great fact testimony that IBM testified to under oath. Mr. Barnes talks about cherry-picking again. Again, to be very clear, we admit 100% that all of the witnesses have relied on the significant transactions provision. We would have loved for them to get them off that, but they didn't. They kept saying, you know what, it's reasonable to rely, but that might apply. We don't cap you, but you can use that, but again, just like the court held in Vincent, we have clearly alleged that that provision did not apply in this case, and ultimately, if we have discovery, and they can prove that that provision was applied, I have strong and great legal arguments against that, but that's an argument they might be able to make on summary judgment. I think they're going to lose it, but they can't make it right now, because we've alleged it doesn't apply, just like it didn't apply in Choplin. And finally, just the last point I made about, again, what is capping? I would fall back on this. The emails that were sent at the time contemporaneously, the best evidence, the non-litigation evidence, they used the word cap again and again and again. Of course they're capping, and some of the witnesses testified, well, that was a mistake, or it was ambiguous. Well, you know what, if it was ambiguous enough for them to use it, then surely an employee in this position could think that what happened here was a cap. I don't think there's no way that IBM could win at this stage on the argument about whether or not it was capped. And finally, we also have the other emails that I didn't even mention today, one of which, quote, we can no longer have folks stand in a room and say there are no caps. That's literally saying we can't do this because it's not true, and paying a rep 50% of what he expected because we are over budget just does not seem fair. The internal evidence here is going to support the plaintiff. All we're asking for at this point is the right to do some discovery. Maybe IBM can make some arguments that I've not thought of as summary judgment. I'd love to argue against them, but right now we're seeking discovery. Thank you. Thank you, counsel. We'll come down and greet counsel and proceed to our next case.
judges: Roger L. Gregory, Robert B. King, A. Marvin Quattlebaum Jr.